CLERK'S OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

AUG 30 2011

JULIA C. DUDLEY, CLERK
BY: /s/ H McDonald
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| SAMUEL ROBERT CONRAD, III,<br>　　Plaintiff, | ) | Civil Action No. 7:10-cv-00560 |
| v. | ) | **MEMORANDUM OPINION** |
| BETTY AKERS, et al.,<br>　　Defendants. | ) | By: Hon. Jackson L. Kiser<br>Senior United States District Judge |

Samuel Robert Conrad, III, a Virginia inmate proceeding pro se, filed a civil rights complaint pursuant to 42 U.S.C. §§ 1983 and 12101, et seq., with jurisdiction vested in 28 U.S.C. §§ 1331 and 1343. Plaintiff names as defendants Betty Akers, the Head Nurse at the New River Valley Regional Jail ("Jail"); Dr. Moses, the Jail's physician; and Gerald McPeak, the Jail's Superintendent. Plaintiff claims that he received insufficient medical care because of discrimination and poverty. The defendants and plaintiff filed motions for summary judgment, and the time to respond has expired.[1] After reviewing the record, I grant the defendants' motion for summary judgment and deny plaintiff's motion for summary judgment.

I.

Plaintiff argues that he has been discriminated against under the Americans with Disabilities Act ("ADA"), the grievance process violates due process, he has not received equal protection under the law, and his medical care violates the Constitution. Plaintiff simply states in his Complaint that Nurse Akers has "shown deliberate indifference" to his physical and mental health in the prior two years. (Compl. 2.) Plaintiff argues that Akers is responsible for his missed medicine doses because she is the head nurse and supervises the other nurses. (Pl.'s Mot.

---

[1] The defendants timely filed their motion for summary judgment, and I deny plaintiff's related motions for default judgment.

Summ. J. (no. 38) 6.) Plaintiff alleges he spoke with Akers on many occasions about the missed doses and that she always replied, "I will check on it." (Id.) However, plaintiff continued to not receive all his medicine on a regular schedule. Plaintiff alleges that Dr. Moses was deliberately indifferent "on or about [September 17, 2010,]" because he "refused to refer [plaintiff] to Dr. Grover to continue hep[atitis]-C treatment as prescribed due to [his] inability to pay." (Compl. 2.) Plaintiff states in his third claim that Superintendent McPeak allegedly "failed to respond appropriately to [his] critical medical issues as per his own policy. . . ." (Id.) Plaintiff concludes that the "negligence in this case lies somewhere in the balance between" McPeak, Moses, and Akers. (Pl.'s Ver. Statement (no. 3) 15.)

Gerald McPeak is the Jail's Superintendent. Dr. Moses is a physician licensed in the Commonwealth of Virginia and treated plaintiff while he was incarcerated at the Jail. (Moses Aff. ¶¶ 1, 2.) Betty Akers, a registered nurse, is the medical department supervisor. (Id. ¶ 30.) Nurse Akers' duties include, in part, the implementation of Dr. Moses' orders. (Id.) Nurse Akers either made or facilitated making the outside appointments with specialists. (Id.) Nurse Akers cannot prescribe medications, order labs drawn, or refer inmates to outside specialists absent emergency situations and must follow Dr. Moses' orders. (Id.) In other words, Akers could not prescribe plaintiff the medications he requested or refer him to a specialist because only Dr. Moses can do those things. (Id.)

Plaintiff was incarcerated at the Jail between October 14, 2008, and February 22, 2010, and between August 8, 2010, and October 20, 2010. During those times, the Jail's medical payment policy provided that no Jail inmate would be denied necessary medical treatment because of an inability to pay. (McPeak Aff. ¶ 4; Moses Aff. ¶ 1.) Nevertheless, an inmate is

2

responsible for paying if he can pay through either a private insurance policy or other independent means. (McPeak Aff. ¶ 4; Moses Aff. ¶ 1.) Thus, the Jail would provide and pay for any necessary medical treatment, but the Jail would deduct the costs from an inmate's financial account. (McPeak Aff. ¶ 4; Moses Aff. ¶ 1.) If the Jail is responsible for the cost, Dr. Moses must follow the Jail's pharmaceutical formulary. (Moses Aff. ¶ 1.) If Dr. Moses thinks a deviation from the formulary is necessary, he must justify the deviation. (Id.) If an inmate has medical insurance, the medical department contacts the insurance company to see what treatment is authorized by the inmate's insurance plan, and Dr. Moses would try to prescribe within the insurance company's formulary whenever appropriate. (Id.) However, once an inmate is accepted by the Virginia Department of Corrections ("VDOC"), the VDOC assumes responsibility for payment of any medical treatment, even if the inmate physically remains at the Jail. (McPeak Aff. ¶ 6.)

When plaintiff first arrived at the Jail on October 16, 2008, he had hepatitis C, seizures, and a Bipolar Disorder. (Moses Aff. ¶ 3.) His medications at that time were Lamictal, an anti-seizure medication; Nameda, a dementia medication; Dilantin, an anti-seizure medication; Aricept, a dementia medication; Abilify, an anti-psychotic medication; and Amoxil, an antibiotic. (Id.) Dr. Moses continued these medications. (Id.) On October 21, 2008, Dr. Moses continued his Dilantin and prescribed him Haldol, which is an anti-psychotic. (Id.)

On December 9, 2008, Dr. Moses ordered a blood test to evaluate plaintiff's hepatitis. (Id. ¶ 5.) After reviewing the lab results on December 18, 2008, Dr. Moses decided to discontinue the prescription for Abilify and Haldol due to plaintiff's increased liver enzymes. (Id.) On January 2, 2009, Dr. Moses ordered that the liver-function test be repeated on March 9,

3

2009, which appears to have been drawn on March 31, 2009. (Id. ¶ 6.)

Dr. Moses saw plaintiff on April 3, 2009, to evaluate his conditions. (Id. ¶ 7.) Plaintiff complained at that time that his mental health symptoms had increased since Dr. Moses stopped the Abilify and Haldol. (Moses Aff. ¶ 7.) Dr. Moses' concerns about plaintiff's increased liver enzymes caused him to refer plaintiff to Dr. Grover, a doctor specializing in the gastrointestinal tract, to evaluate his hepatitis C and liver function and its relationship to his mental health prescriptions. (Id.) Plaintiff had his blood drawn on May 11, 2009, to check the levels of Dilantin[2] in his blood.

Plaintiff was seen by Dr. Grover on May 12, 2009. (Id. ¶ 8.) Dr. Grover ordered more panels and blood tests. (Id.) He ordered prescriptions of Dilantin at 100 m.g. and Lamictal[3] at 200 m.g. Plaintiff received an ultrasound of his liver and gallbladder on May 18, 2009, and they appeared normal. (Medical R. ("M.R.") (Def.s' Mem. Supp. Mot. Summ. J. (no. 34) Ex. C) 34-5 at 16; Moses Aff. ¶ 8.)

Dr. Grover saw plaintiff again on June 2, 2009, for a follow-up appointment. (Moses Aff. ¶ 9.) At that time, Dr. Grover determined that plaintiff could begin weekly Pegasys[4] injections to treat his hepatitis C, but plaintiff did not yet begin the Pegasys injections. (Id.; M.R. 34-5 at 8.) The Jail nursing staff noted the new orders. (Moses Aff. ¶ 9.)

Three weeks later on June 23, 2009, plaintiff reported wavy vision and dizziness. (Id. ¶ 10.) He had slurred speech and stated that he thought his Dilantin level was too high. (Id.) He

---

[2] Dilantin is an anti-seizure medication and relates to both its level in the blood and plaintiff's propensity to experience seizures.
[3] Lamictal is another anti-seizure medication.
[4] Pegasys is a brand-name prescription used to treat hepatitis C. This medication is frequently combined with Ribavirin, which Dr. Grover also ordered, but Pegasys may worsen serious psychiatric conditions. (Moses Aff. ¶ 9.)

4

was sent to the outpatient lab, those labs results were read to Dr. Moses, and he ordered plaintiff to be transferred to the emergency room. (Id.) Another physician suspended plaintiff's Dilantin medication for 48 hours. (Id.) On June 26, 2009, Dr. Moses reviewed new blood tests and wrote plaintiff a new prescription for Dilantin. (Id. ¶ 11.)

Dr. Grover saw plaintiff again on July, 28, 2009. (Id. ¶ 12.) At that time, Dr. Grover indicated that plaintiff could be given Abilify despite his increased liver enzymes. (Moses Aff. ¶ 12.) He noted that plaintiff wanted to start his Pegasys treatment and that plaintiff said his wife had not yet checked with his insurance company to see if it would approve the Pegasys injections. (Id.; M.R. 34-5 at 14.)

On August 31, 2009, Dr. Moses wrote orders for Ribavirin for his hepatitis C. (Moses Aff. ¶ 13.) Dr. Moses saw plaintiff again September 11, 2009, at which time he reported having increased mood swings and hallucinations. (Id. 14.) He was informed that there were other drugs that would not affect his liver enzymes like Abilify; however, he also stated that no other drug worked as well. (Id.) Given plaintiff's statement and Dr. Grover's approval, Dr. Moses ordered Abilify for plaintiff. (Id.) Dr. Moses discontinued plaintiff's Haldol.[5] (Id.)

Plaintiff received his first Pegasys injection on September 22, 2009. (M.R. 34-5 at 22.) The next day, Dr. Grover's assistant called and gave instructions to the Jail medical staff to administer the Pegasys injections and advised that blood work would need to be drawn often. (Moses Aff. ¶ 15.) The assistant also provided information about the treatment and potential side effects. (Id.) Blood work was drawn in accordance with Dr. Grover's order while plaintiff received his Pegasys injection. (Moses Aff. ¶ 16; M.R. 34-3 at 6.)

---

[5] Haldol is an anti-psychotic medicine, like Abilify.

A staff nurse charted on October 30, 2009, that she had received a call from Dr. Grover's office indicating that plaintiff would receive no further treatment after his next follow up visit. (Moses Aff. ¶ 17.) She noted that Dr. Grover's office stated that one more visit and one more lab was all he needed. Dr. Moses avers that he was not made aware of this call at the time but interprets Grover's call that Grover's office did not feel that the continued treatment was no longer necessary. (Id.) However, the nurse noted in plaintiff's progress notes that, based on her conversation with Dr. Grover's office, "Because of no insurance, 1 more visit and 1 more lab is all he needs." (M.R. 34-3 at 6.)

Plaintiff was seen in medical on November 15, 2009, for a cough, but did not tell Dr. Moses about the cessation of Pegasus injections. (Moses Aff. ¶ 18.) However, plaintiff continued to receive medication for his chronic hepatitis C and liver condition, including Enulose and Ribavarin. (Id.)

Plaintiff had his one last appointment with Dr. Grover on December 22, 2009. Dr. Grover wrote for plaintiff's history of present illness, "Pegasys 180 mcg weekly and Copegus [aka "Ribavirin"] 800 mg per day were started on [September 22, 2009]. His insurance did not approve the medicines for hepatitis C treatment; therefore, the treatment was stopped. Lactulose was discontinued in the jail." (M.R. 34-5 at 25.) Dr. Grover recommended that plaintiff receive each day 2 tablespoons of Lactulose. Dr. Grover's request for Lactulose was noted on plaintiff's Physician Orders. (M.R. 34-4 at 3.)

Dr. Moses saw plaintiff again on December 25, 2009, about his medications. (Moses Aff. ¶ 19.) Plaintiff indicated to the nursing staff that he no longer had insurance and that he did not think his mother could provide his medications. (Id.) When he was offered the opportunity to

6

see a mental health provider for his mental health issues, he declined, stating that he had a pending trial and was worried about the complications that a consult may cause him. (Id.; Pl.'s Mot. Summ. J. 5.) Plaintiff told Dr. Moses that his family would pay for his prescriptions and that he would find out which pharmacy to call in the prescriptions. (Moses Aff. ¶ 19.) Dr. Moses renewed his prescription for Lactulose (aka "Enulose") to treat his hepatitis, and plaintiff's mother provided the updated pharmacy information. (Id.) At no time during the visit did plaintiff question or complain to Dr. Moses about the cessation of his Pegasys treatments. (Id.) Dr. Moses avers that if plaintiff had brought it up, he would have sent plaintiff back to Dr. Grover for a consultation. (Id.)

Plaintiff did not contact the medical department again until February 22, 2010, when he submitted a medical request form indicating that his family could no longer afford his medications and he wanted to "finish" his hepatitis treatment. (Id. ¶ 20.) In response to that request, Dr. Moses ordered that an appointment be scheduled with Dr. Grover's office for evaluation. (Id.) This appointment was scheduled for March 23, 2010. (Id.) However, plaintiff was released from the Jail on February 22, 2010, into the custody of the United States Marshals Service. (Moses Aff. ¶ 21.) Consequently, his appointment with Dr. Grover's office was canceled. (Id.)

Plaintiff was transferred back to the Jail on August 8, 2010. (Id. ¶ 22.) Plaintiff received a medical screening on admission, and Dr. Moses continued his current medications that he received at the other Jail, which were Phenytoin (aka "Dilantin") for seizures, Sertraline (aka "Zoloft") for depression, and Omeprazole (aka "Prilosec") for stomach acid. (Id. ¶ 23.) The

7

Jail's medical department requested medical records from the other jail, which showed that he was not receiving Pegasys treatments while housed there. (Id. ¶ 22.)

On September 2, 2010, plaintiff filed a grievance to the medical department to complain that he was not receiving the hepatitis medication prescribed by Dr. Grover. Nurse Akers responded and said that he needed to see Dr. Moses because plaintiff recently re-arrived at the Jail and Dr. Moses would have to reauthorize any medication. On September 3, 2010, plaintiff grieved the fact the medical department ran out of Zoloft for him. Akers informed plaintiff that he had to pay for it and if he could not pay for it then he could see Dr. Moses for him to select a medication that he could substitute for Zoloft.

On September 17, 2010, plaintiff filed a grievance with McPeak to complain that he was still unsatisfied with his medical care. McPeak explained that plaintiff was scheduled to see Dr. Moses that day, Dr. Moses is the person who determines his treatment, and his ability to pay does not determine whether he receives treatment. Dr. Moses saw plaintiff later that day on September 17, 2010. (Id. ¶ 24.) Plaintiff indicated that he had not had any follow-up since he left the Jail in February 2010. (Id.) Dr. Moses ordered Dilantin, Zantac, Elavil,[6] and a hepatitis function test. (Moses Aff. ¶ 24.) Plaintiff claimed that he was now a VDOC inmate, meaning that the VDOC would be responsible for his medical costs. (Id.) Dr. Moses noted that confirmation of that fact was needed because being a VDOC inmate would dictate which formulary Dr. Moses followed. (Id.)

Plaintiff filed another grievance the next day, complaining that Dr. Moses told plaintiff that he could not prescribe his hepatitis medicine without first checking with "[Jail]

---

[6] Elavil is an antidepressant, as is Zoloft.

8

Administration" whether plaintiff was a VDOC inmate yet. McPeak responded, telling plaintiff he will discover whether he is a VDOC inmate.

Mental health staff met with plaintiff on October 4, 2010, to evaluate his bipolar disorder and referred him to a psychiatrist for a psychiatric evaluation. (Id. ¶ 26.) Plaintiff's blood for the hepatitis test was drawn on October 6, 2010. (Id. ¶ 25.) On October 7, 2010, after receiving the results, Dr. Moses ordered that plaintiff see Dr. Grover again to evaluate his hepatitis and need for future treatments. (Id.) Dr. Moses avers that it would not have been medically prudent for him to prescribe medications, like Pegasys, without consulting a GI specialist because of the potential for significant side effects to plaintiff's psychiatric disorders. (Id.)

Before he could keep his appointments with Dr. Grover and the psychiatrist, plaintiff was transferred from the Jail to a VDOC facility on October 20, 2010. (Moses Aff. ¶ 27.) Dr. Moses had no further involvement with plaintiff. (Id.) After reviewing plaintiff's medical records, Dr. Moses avers that the nursing staff appropriately followed and implemented his medical orders. (Id. ¶ 30.) He further avers that nurses placed plaintiff on the physician's list and Dr. Moses saw him whenever plaintiff submitted requests to see the physician. (Id.)

II.

A. THE STATUTE OF LIMITATIONS BARS CLAIMS ACCRUING BEFORE DECEMBER 4, 2008.

Section 1983 adopts the statute of limitations that the forum state uses for general personal injury cases. Owens v. Okure, 488 U.S. 235, 249-50 (1989). Virginia's statute of limitations applicable to § 1983 actions is two years. See Va. Code § 8.01-243(A). However, federal law itself governs the question of when a cause of action accrues. See Cox v. Stanton, 529 F.2d 47, 50 (4th Cir. 1975). A federal cause of action accrues when "the plaintiff has 'a

9

complete and present cause of action'" when the plaintiff "can file suit and obtain relief." Bay Area Laundry and Dry Cleaning Pension Trust Fund v. Ferbar Corp. of Cal., 522 U.S. 192, 201 (1997). See Nasim v. Warden, Md. House of Correction, 64 F.3d 951, 955 (4th Cir. 1995) (en banc) (holding that a cause of action under § 1983 accrues and the statute of limitations begins running "when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action"). Plaintiff filed his Complaint no earlier than on December 4, 2010, the date he signed the Complaint and may have placed it in the prison mailing system. See Houston v. Lack, 487 U.S. 266 (1988) (describing the prison-mailbox rule). Therefore, plaintiff's instant claims must have accrued after December 4, 2008, for them to be timely filed.

Plaintiff arrived at the Jail on October 14, 2008. Plaintiff complains that he did not have access to his mental health prescriptions soon after his arrival and that his criminal defense attorney sent a letter to McPeak asking to receive them. Accordingly, any reference to inadequate medical care plaintiff received in violation of the Eighth Amendment between October 14, 2008, and December 4, 2008, is barred by the statute of limitations.[7]

B.  SUMMARY JUDGMENT STANDARD

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those necessary to establish the elements of a party's cause of action. Anderson v. Liberty

---

[7] Plaintiff specifically states in his Complaint that the alleged Eighth Amendment violations occurred "on or about [September 17, 2010]." (Compl. 2.)

Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. Id. The moving party has the burden of showing – "that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the movant satisfies this burden, then the non-movant must set forth specific facts admissible as evidence that demonstrate the existence of a genuine issue of fact for trial.[8] Fed. R. Civ. P. 56(c); id. at 322-23. A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party. Anderson, 477 U.S. at 248. Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute. Overstreet v. Ky. Cent. Life Ins. Co., 950 F.2d 931, 937 (4th Cir. 1991). A court may neither resolve disputed facts or weigh the evidence, Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility, Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir. 1986). Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor. Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979). However, "[w]hen opposing parties tell two

---

[8] Plaintiff filed as support several statements from other Jail inmates. (Pl.'s Declaration/Affidavit (no. 30) 2-7.) However, none of the statements subject the declarant to the threat of perjury and, thus, do not qualify as affidavits for purposes of Fed. R. Civ. P. 56.

different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007). Furthermore, a party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 62 (4th Cir. 1995). Moreover, a plaintiff cannot rely on a response to a motion for summary judgment to act as an amendment to correct deficiencies in a complaint challenged by a defendant's motion for summary judgment. See Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment."); Barclay White Skanska, Inc. v. Battelle Mem'l Inst., 262 F. App'x 556, 563 & n.16 (4th Cir. 2008) (No. 07-1084), available at 2008 WL 238562, at *6, 2008 U.S. App. LEXIS 1916, at *18-20 (noting that other circuits similarly prohibit a plaintiff from raising new claims in opposition to summary judgment and noting that district courts within the Fourth Circuit have adopted Gilmour).

C.   PLAINTIFF FAILS TO ESTABLISH AN ADA CLAIM.

Plaintiff claims that the ADA was violated because he was denied medications based upon his indigency and the "cost of the medication." (Compl. 7.) To establish an ADA-Title II violation, a plaintiff must show that: (1) he has a disability; (2) he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities for which he was otherwise qualified; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability. See Constantine v. George Mason Univ., 411 F.3d 474, 498 (4th

12

Cir. 2005); Baird v. Rose, 192 F.3d 462, 467 (4th Cir. 1999). The ADA is not violated because a jail simply fails to attend to the medical needs of its disabled prisoners; a plaintiff must show that he was treated in a discriminatory manner because of his disability. See Bryant v. Madigan, 84 F.3d 246, 249 (7th Cir. 1996) (holding that the ADA is not "violated by a prison[] simply failing to attend to the medical needs of its disabled prisoners. No discrimination is alleged; Bryant was not treated worse because he was disabled.").

In this case, plaintiff claims that he allegedly was denied medications for his various conditions because of his indigency, not because of any declared disability. Therefore, plaintiff's own allegations establish that the alleged motive was something other than disability. Accordingly, the ADA is not implicated, and the defendants are entitled to summary judgment for this claim.

D.  PLAINTIFF DOES NOT HAVE A CONSTITUTIONAL RIGHT TO ACCESS GRIEVANCE PROCEDURES.

Plaintiff claims that his grievances were shuffled from office to office with no permanent resolution to them. However, plaintiff does not have a due process or other constitutional right to the Jail's grievance procedures. It is well settled that the Constitution creates no entitlement of a prisoner to grievance procedures or access to any such procedure voluntarily established by a state. Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994). Accordingly, the defendants are entitled to summary judgment for this claim.

E.  PLAINTIFF FAILS TO ESTABLISH AN EQUAL PROTECTION CLAIM.

Plaintiff argues that the defendants violated the Fourteenth Amendment's Equal Protection Clause because of their alleged discrimination based on his disability or poverty. To

13

succeed on an equal protection claim, a prisoner must demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination. Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir. 2001). Once that showing is made, the court next determines whether the disparate treatment can be justified under the requisite level of certainty. Id. The rational basis test applies to cases alleging discrimination based upon a disability. See Klingler v. Dir., Dep't of Revenue, State of Mo., 455 F.3d 888, 894 (8th Cir. 2006) (stating disparate treatment based on disability is subject to the rational basis test).

In this case, there is no evidence that similarly situated prisoners were treated any differently from plaintiff. There are no specifically alleged facts identifying those similarly situated inmates or the disparate treatment. Even if plaintiff was treated differently, there was a rational basis for the manner in which he was treated because his liver condition made treatment of his psychiatric conditions, hepatitis, and seizures. The record reveals that Dr. Moses examined him, ordered labs drawn, prescribed medications and referred him to both a GI specialist and a hospital when appropriate. These facts demonstrate a rational basis for treating him based on his own unique circumstances. Accordingly, the defendants are entitled to summary judgment for this claim.

F.   PLAINTIFF FAILS TO ESTABLISH A DEFENDANT'S DELIBERATE INDIFFERENCE.

Plaintiff may have been a pretrial detainee during a portion of the time period alleged in his claim, and a convicted inmate during the other portion. The Due Process Clause of the Fourteenth Amendment governs a pretrial detainee's claim of denial of medical care. Martin v. Gentile, 849 F.2d 863, 870 (4th Cir. 1988). However, since pretrial detainees are entitled to at

least the same protection under the Fourteenth Amendment as are convicted prisoners under the Eighth Amendment, then courts use the Eighth Amendment's "deliberate indifference" standard of Estelle v. Gamble, 429 U.S. 97, 104 (1976), to evaluate a pretrial detainee's claim. Young v. City of Mount Ranier, 238 F.3d 567, 575 (4th Cir. 2001).

A plaintiff must show that a defendant acted with deliberate indifference to a serious medical need in order to state a claim under the Eighth and Fourteenth Amendments for insufficient medical assistance. Estelle, 429 U.S. at 104. A medical need serious enough to give rise to a constitutional claim involves a condition that places the inmate at a substantial risk of serious harm, usually loss of life or permanent disability, or a condition for which lack of treatment perpetuates severe pain. Sosebee, 797 F.2d at 181-83. In order to show deliberate indifference, a public official must have been personally aware of facts indicating a substantial risk of serious harm, and the official must have actually recognized the existence of such a risk. Farmer v. Brennan, 511 U.S. 825, 838 (1994). "Deliberate indifference may be demonstrated by either actual intent or reckless disregard." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990). See Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 303 (4th Cir. 2004) ("[T]he evidence must show that the official in question subjectively recognized that his actions were 'inappropriate in light of that risk.'"). The prisoner must show that a defendant's action was "[s]o grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Id. Non-medical prison employees can be found to have acted with deliberate indifference if they intentionally delay or deny an inmate access to medical care or intentionally interfere with the prescribed treatment. Estelle, 429 U.S. at 104-05.

15

However, claims of medical malpractice and negligent diagnosis are not cognizable in a § 1983 proceeding. Id. at 105-06. See Sosebee, 797 F.2d at 181; Johnson v. Quinones, 145 F.3d 164, 168-69 (4th Cir. 1998) (noting that treating doctors must actually draw the inference that an inmate's symptoms signify the presence of a particular condition and that a failure to draw such an inference may present a claim for negligence, but not a claim under the Eighth Amendment). A prisoner's disagreement with medical personnel over the course of his treatment does not state a § 1983 claim. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985); Russell v. Sheffer, 528 F.2d 318, 319 (4th Cir. 1975) (per curiam).

Plaintiff's hepatitis C qualifies as a serious medical need. See, e.g., Brown v. Johnson, 387 F.3d 1344 (11th Cir. 2004) (finding that a prisoner's HIV and hepatitis were "serious medical needs" for the purposes of an Eighth Amendment claim). However, the record reveals that Dr. Moses was not deliberately indifferent to plaintiff's hepatitis. Dr. Moses frequently met with plaintiff while he was at the Jail, ordered blood tests, referred plaintiff to a specialist and the emergency room when necessary, and authorized various prescriptions.

Plaintiff's major complaint surrounds the interruption of his Pegasys treatments. Dr. Grover determined on June 2, 2009, that plaintiff should receive Pegasys. Dr. Moses prescribed Enulose in June 2009 and Ribavirin in August 2009 to treat plaintiff's hepatitis. Dr. Grover saw plaintiff again on July, 28, 2009, and noted that plaintiff's wife had not yet checked with his insurance company to see if they would cover the Pegasys injections. (Moses Aff. 12.) Plaintiff received his first, and seemingly only, Pegasys injection on September 22, 2009.[9] On December

---

[9] Plaintiff's medical record includes a "Medication Administration Record" that lists Pegasys, but I cannot ascertain the meanings of the various, scribbled numbers and letters describing its application. (M.R. 34-7 at 11, 13.)

25, 2009, Dr. Moses renewed plaintiff's prescription for Lactulose (aka "Enulose") to treat his hepatitis. Throughout this time, plaintiff repeatedly received blood tests to monitor his hepatitis. Furthermore, plaintiff does not establish deliberate indifference in light of Moses' averments that he was not immediately informed of the suspension of the Pegasys treatments.

Thus, the record establishes that plaintiff was receiving various diagnoses and medications to treat his hepatitis and mental disorders throughout the time he was at the Jail. Although the record establishes that his Pegasys injections were delayed, limited, and ultimately terminated by Dr. Grover in light of ascertaining plaintiff's insurance information, Dr. Moses authorized other hepatitis treatments, blood panels, and consultations. Although plaintiff complains about the delays in seeing mental health professionals, he received various prescriptions for his mental conditions. Plaintiff's dissatisfaction with the course of his treatments and the doctors' decisions about which medications may be prescribed does not implicate a constitutional violation. See Estelle, 429 U.S. at 104; Russell, 528 F.2d at 319 (stating that a prisoner does not have a constitutional right to choose the course of treatment). The Constitution does not guarantee that plaintiff may receive a particular treatment but that plaintiff may receive an appropriate treatment. A correctional doctor does not violate the Constitution by merely choosing to prescribe a medication on its formulary instead of another medication not on its formulary as long as it is prescribed in accordance with medical discretion and Estelle.

Plaintiff also fails to establish a claim for his particular allegation of deliberate indifference "on or about [September 17, 2010]." Plaintiff specifically alleges that Dr. Moses in September 2010 "refused to refer [plaintiff] to Dr. Grover to continue hep[atitis]-C treatment as

17

prescribed due to [his] inability to pay." However, the record reveals that Dr. Moses assessed plaintiff on September 17, 2010, at their first appointment after plaintiff returned to the Jail. Dr. Moses ordered a hepatitis function blood test, and the blood was collected on October 6, 2010. On the next day, the results were reported, and Dr. Moses again referred plaintiff to Dr. Grover to evaluate plaintiff's hepatitis. (M.R. 34-6 at 25.) Plaintiff also had blood drawn again on October 15, 2010, for a basic metabolic panel, and the results were reported the next day. (M.R. 34-6 at 26.) Plaintiff left the Jail before he could attend his consultation with Dr. Grover. Moses avers that plaintiff needed to consult with Dr. Grover again to determine the level of care because certain hepatitis medications, like Pegasys, have significant, potential side effects to plaintiff's psychiatric disorders. Plaintiff's disagreement with Dr. Moses about the propriety of ordering a consultation instead of just immediately ordering plaintiff's preferred prescription does not establish a constitutional violation.

Plaintiff's bipolar condition also qualifies as a serious medical need. See, e.g., Guglielmoni v. Alexander, 583 F. Supp. 821, 826 (D. Conn. 1984) (stating treatment of mental disorders of mentally disturbed inmates is a serious medical need under Estelle). However, none of the defendants were deliberately indifferent to his condition. For example, plaintiff complained in a grievance on September 3, 2010, which was soon after he returned to the Jail, that the medical department exhausted his Zoloft supply and he needed more of it. Nurse Akers responded by informing plaintiff that he had to pay for it if he specifically wanted Zoloft. However, if he could not afford to pay for Zoloft, his preferred drug and what was prescribed at the other jail, he could schedule an appointment with Dr. Moses to find an equivalent prescription paid for by the Jail. Indeed, Dr. Moses met with plaintiff soon thereafter and

18

prescribed another drug, Elavil, to replace plaintiff's Zoloft. Furthermore, even if, arguendo, a defendant delayed any particular treatment in the complete absence of another appropriate treatment for hepatitis or mental illness, the delays were not significant, and plaintiff fails to describe any resulting harm or worsened condition. See, e.g., Webb v. Hamidullah, 281 F. App'x 159, 166-67 (4th Cir. 2008) (collecting cases requiring both significant delay and worsened condition).

Plaintiff also fails to describe how McPeak intentionally delayed or denied him access to medical care or intentionally interfered with his prescribed treatment. The record reveals plaintiff's frequent interactions with the Jail's medical staff, referrals to an emergency room and medical specialist, and numerous medications without any involvement by McPeak. Plaintiff also fails to establish any claim against Akers based on her own conduct. Plaintiff wants to hold her accountable for other nurses' alleged negligence for interrupting his medications. Supervisory liability under § 1983 may not be predicated only on the theory of respondeat superior. See Vinnedge v. Gibbs, 550 F.2d 926, 929 (4th Cir. 1977). Plaintiff also fails to describe how any alleged delay to receive a medication resulted in any worsened condition beyond or a harm beyond the inherent effects of hepatitis and his mental illnesses. See, e.g., Webb, 281 F. App'x 166-167 (collecting cases requiring both significant delay and worsened condition).

In conclusion, plaintiff received significant medical intervention, and his dissatisfaction with the different prescriptions or the time between medical evaluations or prescriptions does not establish a violation of the Eighth and Fourteenth Amendments. Plaintiff also failed to establish a violation of the ADA, the Due Process Clause, or the Equal Protection Clause. Accordingly,

the defendants are entitled to qualified immunity, and I grant their motion for summary judgment. See Saucier v. Katz, 533 U.S. 194, 201 (2001) (stating defendants are entitled to qualified immunity if plaintiff fails to establish a constitutional deprivation).

III.

For the foregoing reasons, I grant the defendants' motion for summary judgment and deny plaintiff's motions for default judgment, summary judgment, and appointment of counsel.

The Clerk is directed to send copies of this Memorandum Opinion and the accompanying Order to plaintiff and counsel of record for the defendants.

**ENTER**: This 30th day of August, 2011.

*[signature]*
Senior United States District Judge